**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **CRIMINAL NO. 20-0124** |
| | : | |
| **HALEEM BALEY** | : | |

**MEMORANDUM**

On or about March 5, 2020, a grand jury returned an indictment charging

Defendant Haleem Baley with possession with the intent to distribute cocaine, in

violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), possession of a firearm in furtherance of a

drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1), and possession of a firearm

by a felon, in violation of 18 U.S.C. § 922(g)(1).

Presently before the Court is Defendant's Motion to Suppress, in which he argues

that the police who conducted a traffic stop of his car lacked reasonable suspicion to

believe he was armed and dangerous and lacked probable cause to believe the car

contained contraband. Accordingly, he seeks to suppress the firearm and cocaine that

were retrieved from his vehicle and the $815 retrieved from his person. This Court held

an evidentiary hearing on Baley's motion on September 28, 2020, at which Philadelphia

Police Officers Daniel Levitt and Zach Zgleszewski testified.

### I.    Findings of Fact

After dark on the night of November 19, 2018, Philadelphia Police Officers Dan

Levitt and Zach Zgleszewski were on routine patrol in North Philadelphia. Tr. at 8 - 11,

1

13[1]. Officer Levitt, who has now been a police officer for nearly 11 years, was driving, and Officer Zgleszewski, an officer for now nearly six years, was the recorder. *Id*. at 6, 51. At about 7:35 p.m., the marked patrol car was parked on 15th Street facing Indiana Avenue while Officer Zgleszewski was filling out paperwork. *Id*. at 51-52, 13. Officer Levitt noticed a Honda Accord traveling eastbound on Indiana pass the patrol car. *Id*. at 10, 52. Officer Levitt asked Officer Zgleszewski if the car had bad inspection stickers and noted he thought that they were expired. *Id*. at 10. Officer Zgleszewski said he had not noticed, *id.*, and the officers pulled out into the road to investigate, *id.* at 10, 52. Before or after they did so, Officer Zgleszewski noticed the car appeared to lack a license plate.[2] *Id.*

When the patrol car reached the Accord, the officers realized it did have a license plate, but the bulbs that were supposed to illuminate the plate were out. *Id.* at 10. Officer Levitt activated his lights and siren after both cars had turned to go northbound on Broad Street. *Id.* at 10, 12. Baley activated his turn signal and pulled over in a timely manner, and Officer Levitt noticed that Baley's turn signal was blinking rapidly. *Id.* at 10, 13, 32. The car stop occurred on Broad Street just south of Clearfield. *Id.* at 63. In the last three years, there had been multiple shootings and multiple homicides in the three-block radius

---

[1] Citations to "Tr. at [page number]" are to the transcript of the September 28, 2020 suppression hearing. *See* Transcript of Record, United States v. Baley, No. 20-124 (Oct. 5, 2020), ECF No. 25.

[2] The officers' accounts differ slightly on when they noticed the purported lack of a license plate. But because Baley does not contest the constitutionality of the traffic stop itself, and, as discussed *infra*, Baley had committed a traffic violation before initiating the stop, this difference is immaterial and the Court affords it no weight in determining the officers' credibility.

of that location. *Id.* at 20-21.

Officer Levitt approached the car on the driver's side; Officer Zgleszewski, the passenger's. *Id.* at 13. Officer Levitt noticed packages and an "Amazon like" reflective vest in the back seat, which led him to believe Baley was a "working guy." *Id.* at 13-14. Baley rolled down the driver's side window, *id.* at 34, and asked why he was being pulled over, *id.* at 13. Officer Levitt explained that he stopped Baley for numerous reasons. *Id.* at 14. He "told him [he] stopped him for expired inspection stickers." He told Baley, "I thought you didn't have a license plate on the vehicle, but you do, [but] the lights are out." And as a "side note," Officer Levitt said, he "noticed when you put your turn signal on, it was blinking real[ly] fast. You probably have a turn signal out in the front." *Id.*

According to Officer Levitt's testimony, Baley then "got very frantic," said "oh, okay, no problem" and got "very upset." *Id.* Baley was acting "beyond nervous," *id.* at 33, and said, "you stopped me for a - - a blinking light . . . That's what you stopped me for?" *Id.* Baley was "holding his hands out in front of him, his eyes were bulging, and he was looking from side to side." *Id.* According to Officer Zgleszewski, who was standing on the passenger's side of the car and could see but not hear Baley, Baley's hands were "literally shaking, almost trembling" and he was "breathing very heavy" like "when you're running." *Id.* at 54. As the conversation continued, Officer Zgleszewski noticed Baley become even more nervous, "frantic almost." *Id.* He was still breathing heavily and his hands were still shaking, but he began "looking left at Officer Levitt and then . . . [would] quickly look over to" Officer Zgleszewski's side, and then back to Officer Levitt's side, then back to Officer Zgleszewski's side. *Id.*

3

On direct examination, Officer Levitt testified that he noticed a mixture of air freshener and a slight odor of marijuana when he approached the car. *Id.* at 15. He also testified that he saw ashes in the ashtray and a pump spray right next to it in the console. *Id.* He described the spray as "basically . . . a marijuana spray" that he had seen numerous times in that area and that people use to cover the odor of marijuana. *Id.* at 16. On cross-examination, he explained that he did not immediately smell the marijuana when he first approached and spoke with Baley. *Id.* at 35. He also testified that, while he had to lean down to speak to Baley because of the traffic on Broad Street, his head was never stuck in the car. *Id.* And while the marijuana smell could not have come from the street, he could not tell whether it was coming from Baley or his vehicle. *Id.* Finally, he could not tell whether the odor was of burnt or raw marijuana because of the amount of air freshener masking the odor. *Id.*

Officer Levitt was then confronted with testimony he gave in a preliminary hearing in municipal court in the Philadelphia Court of Common Pleas. At that hearing, Officer Levitt had explained that he kind of stuck his head in the car after he smelled the air freshener and saw the pump mister:

> "I . . . told him, it's no big deal. Let me get your information. There was an odor of freshly sprayed air freshener in the car, like very fresh, and I looked over at the center console and there was a pump master - - mister. . . It was sitting right there. *I kind of stuck my head in the car*. It was a very faint, I thought – believed, odor of marijuana. There was a lot of ashes in the ashtray, so I thought maybe he was just masking marijuana."

Tr. at 40 (emphasis added).

When confronted on cross-examination with that testimony, Officer Levitt

explained that he "does[n't] think [he] meant [he] stuck [his] whole head in the car, but if that's what it says, that's what it says . . . I have never stuck my whole head . . ." *Id.* He also explained that he did not recall when he saw the ashes. *Id.* at 36. But when defense counsel asked Officer Levitt whether, "if the preliminary hearing notes indicate that it was after you stuck your head in head car that you observed the ashes and after you stuck your head in the car that you smelled the marijuana, you would have no quarrel with that, correct?," Officer Levitt said "[y]ou're absolutely right." *Id.* And in response to defense counsel's question that "when [he] was standing there and sticking [his] head in the car, [he was] investigating not only the car stop, but what [he] believed to be something else . . . correct?", Officer Levitt answered "yes." *Id.* at 42.

The Court finds that Officer Levitt at least partially stuck his head in the car and that he did not smell marijuana or see ashes until he did so. The Court so finds because the preliminary hearing occurred only two months after the events in question, because Officer Levitt testified at the suppression hearing that he does not recall exactly where his head was or when he noticed the ashes, and because he conceded that the preliminary hearing notes would be correct.

Officer Levitt then asked Baley for his license and registration. Baley provided his driver's license, though his "hand was shaking violently." *Id.* at 17. Officer Levitt asked for Baley's registration, but Baley – without looking for it – said he did not have it. *Id.* Officer Levitt asked if Baley was even going to look, at which point Baley "kind of fake looked for it" by patting around. *Id.* Officer Levitt then asked if Baley was going to "look around again, look in the – glove compartment, something?" *Id.* According to Officer

Levitt's testimony, Baley then "got real upset." *Id.* While Baley reached for the glove box with his right hand, he kept his face to the left – away from his hand and the glove box – and his eyes on Officer Levitt the whole time. *Id.* at 17, 19. Baley quickly opened and shut the glove box without looking toward it. *Id.* at 18. Baley then said "no, it's not in there" in a very shaky manner. *Id.* at 17, 20.

In the second or two the glove box was open, Officer Levitt noticed a "big white package" in the glove box that, while he was not sure, he believed "looked conducive with narcotics packaging." *Id.* at 18; 46.

Officer Zgleszewski corroborated Officer Levitt's testimony on this interaction. Officer Zgleszewski saw Baley "open[] the glove box for maybe a second and then quickly slam[] it shut, which was a red flag to [him]." *Id.* at 54. At that point, Officer Zgleszewski got Officer Levitt's attention and motioned to him to have Baley removed from the vehicle. *Id.* at 55.

Officer Levitt asked Baley to step out of the vehicle. Tr. at 21. Officer Levitt testified that he did so because he believed there were narcotics in the glove box and because Baley's "whole demeanor . . . felt gun the whole time" and he was concerned for his safety. *Id.* at 21-23.

Both officers walked with Baley to the patrol car. Officer Levitt testified that Baley's manner of walking was "stiff," "almost robotic," and Officer Zgleszewski testified that Baley was tense, stiff, and would take a few steps and then stop. *Id.* at 21, 58. Officer Levitt explained that he asked Baley to sit in the police car, but he did not handcuff Baley at this point. *Id.* at 21. Officer Levitt later testified on cross-examination

that he patted Baley down before placing him in the patrol car. *Id.* at 46. While walking to the car, Baley kept saying "I just want to go home. I just want to see my daughter." *Id.* at 21. The officers told him to calm down, that he was going to see his daughter. *Id.* at 22, 58. After Baley got into the police car, he replied that "no, I'm not." *Id.* at 22, 58. Baley leaned forward and put his head in both his hands. *Id.*, *id.*

Officer Zgleszewski remained in the patrol car with Baley, and Officer Levitt returned to Baley's car. Officer Levitt first looked under the driver's seat because he believed there was a gun there. Tr. at 23. There was not, so he went into the glove box to frisk that area. *Id.* He also felt he could search the car because of the odor of marijuana. *Id.* The glove box was broken; it was not connected to the car. *Id.* Instead of opening a few inches, it flipped all the way open and almost touched the floor. *Id.* at 24, 60, 61. Two large white bags of what ended up being cocaine fell out of the glove box. *Id.* at 24.

Because of the large quantity of narcotics involved, Officer Levitt believed there was either a gun present or someone nearby with a gun protecting the narcotics. *Id.* He called for backup, went back to the patrol car, searched Baley, and placed him in handcuffs. *Id.* at 25. Although Officer Levitt did not recover the money during that search, Baley was found to have $815 in multiple denominations on his person at some unspecified later time. *Id.*

Officer Levitt returned to Baley's car with the backup officer who had arrived. Officer Levitt was stunned he could not find a gun because of Baley's behavior and the quantity of narcotics. *Id.* at 26. He "kept searching the car," asked the backup officers who had arrived for their opinions and asked them to watch the street to make sure no

7

one was driving by with a gun to protect Baley. *Id.* He then stopped searching and began talking to the backup officer by the passenger side of the car. *Id.* During that discussion, Officer Levitt looked over to the car and saw a gun. It was behind the broken glove box, which was swinging down, near the HVAC unit and the air conditioning filter. *Id.* at 26. He had not seen it before because it was black and everything around it was black. *Id.*

Baley was arrested and charged by state authorities on the date of the incident. A federal indictment followed, charging him with possession with the intent to distribute cocaine, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a felon. He has moved to suppress the physical evidence of the firearm, narcotics, and $815 in multiple denominations found on his person, arguing that his Fourth Amendment rights were violated.

## II.    Legal Standard

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. Generally, for a search or seizure to be reasonable, it must be carried out with a warrant based on probable cause. *See United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002); *see also Katz v. United States*, 389 U.S. 347, 356-57 (1967)). The burden of proof is generally on the defendant seeking to suppress evidence. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). But "once the defendant establishes a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *Id.* (citing *United States v. Deaner*, 1 F.3d 192, 196 (3d Cir. 1993))*; see also Riley v. California*, 573 U.S. 373, 382 (2014) ("In the absence of a

warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement") (citing *Kentucky v. King*, 131 S. Ct. 1849, 1856-57 (2011)). The government bears its burden by establishing by a preponderance of the evidence that its actions were constitutional. *See United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

### III.    Discussion

A traffic stop is a 'seizure' within the meaning of the Fourth Amendment. *See United States v. Delfin-Colina*, 464 F.3d 392, 396 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Thus, for the traffic stop and searches to be constitutional, the government must prove that they fell within exceptions to the warrant requirement. The government argues that the traffic stop itself falls within the investigatory detention exception articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). The government also contends that the searches of Baley's car and person fall within the *Terry* exception because they were supported by reasonable suspicion that Baley was armed and dangerous. Finally, the government also argues that the search of Baley's car falls within the automobile exception to the warrant requirement because it was supported by probable cause to believe the car contained contraband. Each exception will be discussed in turn.

### A.  The traffic stop was justified because Baley violated traffic laws.

Traffic stops fall within the framework for investigatory detentions first articulated in *Terry v. Ohio*, 392 U.S. 1 (1968)). Under the *Terry* exception, an officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot." *United States v. Brown*, 448 F.3d 239, 243 (3d Cir. 2006) (quoting *Illinois v. Wardlow*, 528 U.S. 119,

123 (2000)). "In *Whren v. United States*, the Supreme Court established a bright-line rule that any technical violation of a traffic code legitimizes a stop." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)).

As Baley concedes, the traffic stop of Baley's car was legitimate. The evidence shows that officers Levitt and Zgleszewski possessed "specific, articulable facts" that Baley "was violating a traffic law at the time of the stop." *Delfin-Colina*, 464 F.3d at 398. Officer Levitt first noticed the expired inspection stickers on the defendant's car, *see* Tr. at 10, which is a violation of state law, *see* 75 Pa. C.S. § 4703. After first believing the car did not have a license plate, the officers noticed there was a license plate but that it was not illuminated by a functioning light – also a violation of state law. *See* Tr. at 10; 75 Pa. C.S. § 4303(b). Finally, after turning on the siren and initiating the stop, the officers noticed that Baley's turn signal was blinking rapidly, indicating that a front turn signal was likely burnt out in violation of 75 Pa. C.S. § 4303(c). Tr. at 14. Because Baley violated state traffic laws, the officers were constitutionally permitted to stop his car.

**B. Because reasonable suspicion justified the frisk of the passenger compartment of Baley's car, the evidence will not be suppressed.**

**1. Reasonable suspicion supported the frisk of Baley's vehicle.**

The government argues that Officer Levitt's search of Baley's person and car falls within the bounds of protective frisks under *Terry*, 392 U.S. 1 (1968). Once a police officer has properly stopped a vehicle, the officer may "exercise reasonable superintendence over the car and its passengers," including by ordering the driver out of the vehicle. *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (citing

*Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977)). If a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger," an officer may frisk a person for weapons during an investigatory stop. *Terry*, 392 U.S. at 27. Such frisks are constitutional if the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Moorefield*, 111 F.3d 10, 12 (3d Cir. 1997) (quoting *Terry*, 392 U.S. at 21).

Under the same principle, officers may conduct a 'frisk' of a passenger compartment of a vehicle where a weapon may be placed or hidden. The officer must have a reasonable belief based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (citation and quotation marks omitted). An officer may conduct a protective 'frisk' of the passenger compartment even when the vehicle's occupants are outside the vehicle. *Id*. at 1051-52.

Reasonable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Delfin-Colina*, 464 F.3d at 396 (quoting *Wardlow*, 528 U.S. at 123). "The principal components of a determination of reasonable suspicion . . . will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion." *Orlenas v. United States*, 517 U.S. 690, 696 (1996); *see also Brown*, 448 F.3d at 246

11

("The ultimate question is whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the defendant's] detention.") (quoting *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2003)).

Courts look to "the totality of the circumstances, the whole picture" in deciding whether there was reasonable suspicion. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Weight must be given "not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. The "totality of the circumstances includes an officer's knowledge, experience, and common sense judgments about human behavior." *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002).

The government argues that Officer Levitt's protective 'frisk' of the car was supported by reasonable suspicion that Baley was dangerous and had access to a weapon. The officers' testimony, which, as explained *infra*, the Court finds credible, reveals three factors relevant to the reasonable suspicion analysis: Baley's frantic behavior, the way he opened and closed the glove box, and the location of the stop. Each will be explained and then considered in totality.[3]

---

[3] In its brief in opposition to Baley's suppression motion, the government cites the following circumstances known to Officer Levitt at the time of the search: the odor of marijuana and air freshener, the latter of which he could see in the cup holder; the ashes surrounding the cupholder; Baley's agitation and shaking hands; Baley's manner of looking around; Baley's reluctance to open the glove compartment; Baley's manner of opening and shutting the glove compartment; the package with a white substance in the glove compartment; Baley's stiff manner of walking to the patrol car; and Baley's statements on the way to and once inside the patrol car. However, the government cites

### a. **Baley's Nervousness**

The testimony shows that Baley's nervousness played a role in the officers' belief that he was armed or had ready access to a weapon. Officer Levitt testified that Baley was "frantic;" he was holding his hands out in front of him, eyes bulging, and looking side-to-side. Tr. at 14. He testified that "when someone's looking around and . . . checking out the area, I feel like they're looking for two things when they do that, witnesses or an escape route." In his experience, when someone does that, there is "something in the car." *Id.* at 22. Based on Baley's behavior, Officer Levitt "felt there was something in the vehicle, perhaps a gun." *Id.* at 21. Officer Zgleszewski corroborated Officer Levitt's testimony, explaining that Baley "appeared extremely nervous," "became frantic almost," was breathing heavily, and was looking back and forth between Officer Levitt's and Officer Zgleszewski's sides of the car. *Id.* at 54.

"[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also, e.g., United States v. Johnson*, 452 F. App'x 219, 226 (finding nervous behavior relevant to reasonable suspicion that an individual is armed and dangerous). But, as Baley argues, it is likely not enough on its own. *See Brown*, 448 F.3d at 251 (recognizing that "nervous, evasive behavior" may suggest suspicious behavior but may be insufficient on its own to

---

these facts and circumstances to support both reasonable suspicion that Baley had ready access to a weapon and probable cause that the vehicle contained narcotics. The Court considers all of these circumstances in the reasonable suspicion analysis, but concludes that reasonable suspicion stems from only Baley's frantic behavior, his reluctance to open and manner of opening the glove box, and the location of the stop.

establish reasonable suspicion); *see also United States v. Bonner*, 363 F.3d 213, 217 (3d

Cir. 2004) ("The Supreme Court has never held that unprovoked flight alone is enough to

justify a stop."); *United States v. Alvin*, 701 F. App'x 151, 155 ("We . . .  resist the

implicit invitation to elevate nervousness – or even an isolated evasive act – to the level

that would allow police to detain anyone whom they conclude is nervous or trying to

avoid them as they approach.").

Baley also argues that his nervousness should not weigh heavily in the calculus

because he could have been nervous from the traffic stop itself as opposed to any

narcotics or firearm in his vehicle. It is true that a person, "whether innocent or guilty,"

may "exhibit signs of nervousness when confronted by a law enforcement officer." *Alvin*,

701 F. App'x at 155 (quoting *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997)).

An officer unacquainted with the person he or she is detaining could also mistake that

person's normal behavior for nervousness. *See United States v. Simpson*, 609 F.3d 1140,

1147-48 (10th Cir. 2010). But "[e]xtreme and persistent nervousness" evidenced by

"specific indicia that the defendant's nervousness was extreme" can alleviate some of

these concerns and entitles an individual's nervousness to weight in the calculus. *Id.* at

1148; *cf. Arvizu*, 534 U.S. at 275-76 (finding that acts individually susceptible to innocent

explanation can collectively amount to reasonable suspicion).

### b. Opening and Closing the Glove Box

Both officers testified that the way Baley opened and closed the glove box without

searching it for his registration was unusual. According to Officer Levitt, Baley's

reluctance to look for his registration and the way he "reached over, look[ing] at [Officer

14

Levitt], open[s], closes, and . . . says nope, not in there" in a shaky manner played a role in his belief that Baley might have a gun in the car. Tr. at 49, 20. Officer Zgleszewski described Baley's quick open-and-close of the glove box as a "red flag," fearing that "if there was something in" the glove box, Baley "didn't want [Officer Zgleszewski] to [see] it." *Id.* at 55.

To the extent that Baley argues that he only opened the glove box so quickly because it was broken, that contention is irrelevant. Courts do not look to the actual reason why an individual acted a certain way, but to whether "the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 21-22 (citation and quotation marks omitted). Neither officer knew at the time Baley opened the glove box that it was broken. In any event, it was not only the speed with which Baley opened and closed the glove box that Officer Levitt found suspicious, but also the fact that Baley did not even look toward it while purportedly searching it for his registration. The Court thus considers Baley's mannerisms in this respect as part of the totality of the circumstances.

### c. High-Crime Area

The location of the stop is also relevant to the Court's analysis. Both officers testified that the traffic stop occurred in a high-crime area. Officer Levitt explained that the stop occurred in a high-drug area that had experienced multiple shootings at a playground and multiple homicides within the previous three years, *id.* at 36, 21. Officer Zgleszewski also reported responding to numerous shootings and homicides in the three-block radius surrounding the stop. *Id.* at 56.

The location of the stop is not alone sufficient to find reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that a person is committing a crime."). But "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.* Thus, the fact that a stop occurs in a 'high crime area' is "among the relevant contextual considerations in a *Terry* analysis." *Id*; *see also United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) (finding the stop's location in a high-crime area relevant to whether officers had reasonable suspicion to justify a frisk).

### d. Totality of the Circumstances

In support of his motion, Baley attempts to undercut the relevance of the above circumstances by questioning Officer Levitt's credibility.[4] Baley claims that Officer Levitt is not credible because his testimony at the suppression hearing contradicted his testimony at a preliminary hearing in January 2019 in state court. Tr. at 70. Baley points to Officer Levitt's testimony at the suppression hearing, where he initially said his "head was never stuck in the car," and contrasts this with his testimony at the preliminary hearing where he explained that he "kind of stuck [his] head in the car." Second, Baley argues that Officer Levitt's testimony with respect to his fear for his safety is not credible

---

[4] At the suppression hearing, Baley focused his arguments on the alleged lack of probable cause to believe the car contained contraband. Because many of those arguments also apply to the reasonable suspicion context, the Court addresses the relevant arguments here.

16

because Officer Levitt allowed Baley to move around the passenger compartment after noticing Baley's frantic behavior and because Officer Levitt did not handcuff Baley after removing him from the vehicle. *Id.* at 67-68, 72-73. And third, Baley suggests Officer Levitt's testimony is not credible because it was not possible to observe something conducive with narcotics packaging in the glove box in the short time Baley opened it. The Court disagrees and finds him credible for the following reasons.

The inconsistent testimony does not undermine Officer Levitt's credibility. As he explained, he was asked at the suppression hearing to parse a less-than-one-minute interaction nearly two years after it occurred. *Id.* at 43. Moreover, the preliminary hearing that took place over a year and a half before the suppression hearing was conducted for a different purpose and when Officer Levitt's memory was presumably fresher. And his prior testimony was that he "kind of stuck his head" in Baley's car, not that he placed his entire head through the window. While Officer Levitt might be expected to remember fully sticking his head in a car, the fact that he did not remember "kind of" doing so – which, to him, probably seemed an innocuous action – does not undermine his credibility.

The Court also finds Officer Levitt's description of his fear for his safety to be credible. Baley claims that Officer Levitt embellished his testimony about Baley's nervousness because Officer Levitt would not have asked him to look around for his registration or suggest he look in the glove box if, based on Baley's frantic behavior, Officer Levitt was already concerned that there could be a gun in the passenger compartment. The Court finds Officer Levitt's testimony in this respect credible for two reasons. First, Officer Levitt's concern could have been present at that point but reached

17

critical mass after Baley's method of opening and closing the glove box. Second, Officer Levitt's concern and description of Baley's behavior were corroborated by Officer Zgleszewski, who the Court also finds credible. Officer Zgleszewski noted Baley's extreme nervousness and explained that he was concerned that there was a gun in the car in part because of Baley's body language. Tr. at 55-56.

Baley also claims that Officer Levitt's concern and description of Baley's behavior was embellished because, if he were really that concerned, he would have handcuffed Baley upon removing him from the vehicle. But Officer Levitt testified that he frisked Baley before placing him in the patrol car, Tr. at 46, which occurred immediately after removing Baley from his vehicle and walking him to the patrol car. The Court declines to find that the decision to not handcuff him immediately upon removal from his car undermines the officers' credibility regarding Baley's nervousness. Because the officers credibly testified about Baley's extreme nervousness, the Court considers it in the totality of the circumstances.[5]

Based on the totality of the circumstances, Officer Levitt had reasonable suspicion that Baley was armed and dangerous. Officer Levitt's statement that he "felt gun the whole time" is alone insufficient. *See Terry*, 392 U.S. at 27 (stating an officer's "inchoate

---

[5] Nor does Officer Levitt's testimony with respect to the package in the glove compartment undermine his credibility. Although a lay person may be unable to form a belief that he saw something conducive with narcotics packaging so quickly, the Court believes Officer Levitt's testimony that he, a veteran police officer, believed, though he was not sure, that what he saw was conducive with narcotics packaging.

18

and unparticularized suspicion or 'hunch,'" does not constitute reasonable suspicion). But there are sufficient objective, articulable reasons justifying the search here.

Baley's nervousness as credibly described by both officers was extreme and contributed to reasonable suspicion. In Officer Levitt's experience, Baley's nervousness was beyond the norm expected from individuals subject to traffic stops. *See id.* at 33-34 (Q: "Some people could be more nervous than others when stopped by a police [officer], yes?" A: Not to that level . . . I've never had one [to] that level and not have something going on."). The Court also considers Officer Levitt's testimony that, when someone is looking around the way Baley was, he believes they are looking for either witnesses or an escape route. *See id.* at 22. In Officer Levitt's experience, every time someone has done that, "something was inside the car . . . that they do not want –." *Id.* And according to Officer Zgleszewski, Baley's mannerisms – the heavy breathing and shaking hands – were consistent with those of individuals from whom he had recovered firearms in the past. *Id.* at 56. The Court thus gives due weight to these indicia of extreme nervousness and the inferences drawn from them in light of the officers' experience. *See Simpson*, 609 F.3d at 1148; *see also Terry*, 392 U.S. at 27.

The way Baley opened and closed the glove box while purportedly looking for his registration also struck both officers as abnormal. Officer Zgleszewski believed Baley was trying to conceal something, *see* Tr. at 55, and Officer Levitt said Baley's actions in this respect played a role in his belief that Baley might have a gun in the car. *Id.* at 49. To be sure, the way Baley 'searched' the glove box would also be conducive with an attempt to hide contraband. Officer Levitt himself believed, presumably based in part on the

white package he saw inside, that the glove box contained narcotics. *Id.* at 18, 21. But this belief does not negate reasonable suspicion that the car, or even the glove box, contained a weapon or the relevance of the way Baley 'searched' that box to the reasonable suspicion analysis.

In *United States v. Moorefield*, the Third Circuit considered whether a firearm recovered during a *Terry* frisk subsequent to a vehicle stop should be suppressed. 111 F.3d 10 (3d Cir. 1997). The defendant in that case ignored the officer's instructions to remain in the car with his hands in the air. *Id.* at 12. He instead leaned back and shoved something down toward his waist, pushed his upper body through the window, and raised and lowered his hands several times. *Id*. At the suppression hearing, the officer testified that, "based on his experience, [the defendant's] behavior was consistent with the behavior of a person trying to conceal something." *Id.* at 14. The Third Circuit found it inconsequential that the officer "testified that he was not sure whether [the defendant] was attempting to hide narcotics or a firearm." *Id.* Quoting *Terry*, the Court explained that an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* (quoting *Terry*, 392 U.S. at 27). The Third Circuit then concluded that the defendant's "behavior embodied the kind of specific, articulable facts" that warranted a frisk. *Id.*

As in *Moorefield*, the alternative explanation that Baley could be concealing narcotics is inconsequential to reasonable suspicion. Like the officer in that case, the officers here believed that Baley's actions were consistent with an attempt to conceal

something. Whether the officers were sure that that 'something' was contraband or a weapon is inconsequential as long as reasonable suspicion to believe it could be either, or both, existed. To be sure, Officer Levitt did believe that the glove box contained contraband. But Officer Levitt also testified that the way Baley 'searched' the glove box played a role in his belief that Baley had a gun, and Baley's furtive action, combined with his nervousness and the high-gun-crime area, warranted reasonable suspicion that Baley had access to a weapon notwithstanding a simultaneous belief that the glove box contained narcotics. As explained, Baley's nervousness exceeded 'normal' nervousness, Officer Levitt believed based on his experience that someone looking back and forth was looking for witnesses or an escape route, and Officer Zgleszewski testified that Baley's mannerisms were consistent with those of armed individuals.

In sum, Baley's actions and mannerisms, combined with the reasonable inferences the officers drew from them in light of their experience and the high-crime area where the stop occurred, embody "the kind of specific, articulable facts that *Terry* contemplates" and warranted a *Terry* frisk of Baley's car. *Moorefield*, 111 F.3d at 14.

### 2. Because reasonable suspicion supported the frisk of Baley's car, the evidence was constitutionally recovered.

Because Officer Levitt was justified in frisking Baley's car for weapons, the evidence recovered from the car and Baley's person will not be suppressed.

If, while "conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband, and the Fourth Amendment does not require its

suppression in such circumstances." *Long*, 463 U.S. at 1050 (citing *Coolidge v. New Hampshire*, 403 U.S .443, 465 (1971)). Because the cocaine was found during a legitimate *Terry* search of the passenger compartment of Baley's car, the Court will deny the suppression motion as to the cocaine.

The Court will also deny the suppression motion as to the firearm found behind the glove box. *Terry* frisks of vehicles are limited to passenger compartments, *see Long*, 463 U.S. at 1049. Ordinarily, the engine area of a car cannot be described as within the passenger compartment. But while the firearm was located by the HVAC unit behind the glove box, the glove box in Baley's car was broken, allowing the box to fall forward out of the dashboard upon being opened. Thus, the Court holds that the area in which the gun was hidden in Baley's car constitutes part of the passenger compartment for *Terry* purposes and could therefore be lawfully 'frisked.' *See Long*, 463 U.S. at 1037, 2049-50 (permitting a pat-down under the car seats and dashboard and in the glove box – areas where someone could place or hide weapons and reach quickly). But even if the area behind the broken glove box could not be described as an area within the passenger compartment subject to a *Terry* frisk, the Court finds, as discussed below, that probable cause supported the search of the vehicle both at the time Officer Levitt returned to search the vehicle after securing Baley in the patrol car and once the cocaine was found pursuant to a lawful *Terry* frisk of the passenger compartment.[6] Therefore, the firearm was lawfully recovered.

---

[6] As the government points out, the firearm was technically not recovered via a search of the vehicle but was rather viewed from outside the car after Officer Levitt had abandoned

Finally, the Court will deny the suppression motion as to the $815 located on Baley's person. The officers did not testify as to when this $815 was recovered from Baley. The testimony shows that Baley was frisked twice during the course of the car stop. *See* Tr. at 46 (Officer Levitt explaining on cross examination that he frisked Baley before placing him in the patrol car); Tr. at 25 (Officer Levitt explaining on direct examination that he returned to the patrol car, searched, and handcuffed Baley after finding the narcotics). But Officer Levitt did not find the $815 during either of these searches. *See id.* at 25 (explaining, while discussing the post-narcotics recovery frisk, that "at that point we didn't recover it yet, but he did have . . . on his person . . . approximately $815 of currency"). This testimony leads the Court to conclude that the $815 was recovered after the events to which the officers testified. And based on Baley's concession in closing argument, the Court accepts that the funds were recovered incident to Baley's arrest. *See* Tr. at 74 ("I would ask you to suppress not only the gun, the drugs, but as a fruit of the poison[ous] tree, the $815 incident to arrest that was recovered."). Therefore, the constitutionality of the frisks of Baley's person discussed in the suppression hearing and referenced in the motion papers are ultimately irrelevant to Baley's motion because the $815 was not recovered during these frisks.[7]

---

his search for a weapon. Tr. at 26. But because the Court finds Officer Levitt could lawfully have searched the area in which the firearm was found, the Court need not address the applicability of the 'plain view' doctrine raised by the government.

[7] But if Baley's pre-arrest pat-downs were before the Court, the Court would conclude they were supported by reasonable suspicion for the same reasons as the *Terry* frisk of Baley's car.

Instead, because the large amount of narcotics and the firearm recovered pursuant to constitutional searches created probable cause to arrest Baley, the search incident to arrest was lawful here. Officers "do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has committed a felony." *United States v. Burton*, 288 F.3d 91, 98 (3d Cir. 2002) (quoting *United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992)); *see also United States v. Franklin*, 728 F.3d 994, 999 (8th Cir. 1984) ("Intent to distribute a controlled substance has been inferred solely from possession of a large quantity of the substance.") (collecting cases). Because Officer Levitt found a large quantity of narcotics and a firearm in Baley's car, probable cause existed to arrest him, which justified the subsequent search. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("[W]e hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."). Therefore, the Court will not suppress the $815 found on Baley's person.

## C. Probable Cause to Search Car

The government alternatively argues that the search of Baley's vehicle falls within the automobile exception to the warrant requirement. That exception allows officers to search a car without a warrant if "probable cause exists to believe it contains contraband." *Burton*, 288 F.3d at 100 (quoting *Pennsylvania v. Labron*, 288 F.3d 938, 940 (1996)). In such cases, an officer may search any area of the vehicle in which the evidence might be found. *See Arizona v. Gant*, 556 U.S. 332, 339 (2009).

"The probable cause inquiry is commonsense, practical, and nontechnical; it is based on the totality of the circumstances and is judged by the standard of reasonable and prudent men." *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)) (internal quotation marks omitted). Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." *Gates*, 462 U.S. at 232. Courts must "evaluate the events which occurred leading up to the . . . search, and then . . . [decide] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause." *Donahue*, 764 F.3d at 301 (quoting *Orlenas v. United States*, 517 U.S. 690, 696 (1996)) (alterations in original). If there was a "fair probability that contraband or evidence of a crime would have been found [in a particular place], there was probable cause for the search." *Id.* (quoting *Gates*, 462 U.S. at 238).

The government argues that Officer Levitt, based on his training and experience, had probable cause to believe that the car contained contraband at the time he searched it after placing Baley in the patrol car. In the alternative, assuming *arguendo* that probable cause did not support Officer Levitt's search at that time, the government argues that probable cause supported a continued search once the cocaine was found in the glove box. The Court begins with the first timeframe.

### 1. Probable cause to search existed upon Officer Levitt's return to the vehicle.

The officers' testimony reveals that the following facts were in Officer Levitt's knowledge when he searched the vehicle after putting Baley in the patrol car: (a) Baley's

mannerisms, including his nervousness, the way he looked back-and-forth, and the stiff way he walked to the patrol car; (b) the white package in the glove compartment and Baley's efforts to conceal the contents of the glove box; (c) the high-crime area they were in; (d) Baley's statements on the way to and once inside the patrol car; and (e) other factors, including the odor of marijuana combined with the strong odor of air freshener, the air freshener spray in the console, and the ashes surrounding the cupholder. Each will be explained and then the totality of the circumstances considered.

### a. Mannerisms

As with the reasonable suspicion analysis, Baley's nervousness and mannerisms factor into the probable cause inquiry. *See United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996) (considering defendant's nervousness in the totality of the circumstances supporting probable cause); *United States v. Jackson*, 682 F. App'x 86, 88 (3d Cir. 2017) (finding nervousness and evasiveness relevant in the probable cause determination). Baley argues the testimony about his nervousness was embellished or is irrelevant, but, as explained *supra*, the Court disagrees. Therefore, the Court will consider the officers' testimony about Baley's extreme nervousness and Officer Levitt's testimony that, based on his experience, the way Baley looked back and forth suggested something was in the car. *Tr.* at 22. The Court also credits the testimony from both officers that Baley walked in a stilted and halting way to the patrol car.

### b.  Package in the Glove Box and Efforts to Conceal

Officer Levitt testified that he saw a "big white package" that, while he was not sure, "looked conducive with narcotics packaging" inside the box during the brief period

Baley opened it. Tr. at 18. Defense counsel asked Officer Levitt whether "the best [he] could describe it is that [he] observed something white," and Officer Levitt said yes. *Id*. at 46. But he explained on direct that he believed the white package was narcotics because of Baley's "frantic behavior, the way he was shaking, the quick opening and closing, the staring at [Officer Levitt]. The high drug and gun area – crime area that [they] were in" all led him "to believe that that was some type of narcotics." *Id*. at 20.

Baley argues that no one could not have seen the white package and ascertained that it was narcotics in the brief second Baley had opened the glove box. Tr. at 70-71. As explained earlier, the Court finds Officer Levitt's testimony as to what he saw in the glove box and his beliefs about it credible. *See supra*, n.5. The Court will therefore consider in the totality of the circumstances the white package that Officer Levitt believed, though he was not sure, to be conducive with narcotics packaging based on the surrounding circumstances. The Court will also consider the way Baley opened and closed the glove box, which led the officers to believe Baley did not want them to see its contents. *See United States v. Pughe*, 441 F. App'x 776, 778 (2d Cir. 2011) (finding relevant to probable cause baggies that an officer noticed in the glove box and believed most likely to be crack cocaine and the fact that the defendant made it obvious she was trying to conceal the glove box's contents by closing it in front of the officer).

### c.  High-Crime Area

As in the reasonable suspicion analysis, the location of the stop in a high-crime area is a relevant factor to probable cause. *See United States v. Humphries*, 372 F.3d 653, 660 (4th Cir. 2004) (considering an individual's presence in a high-crime area as a factor

supporting probable cause); *see also Wardlow*, 528 U.S. at 124 (finding the location of a

stop in a high-crime area relevant in a reasonable suspicion analysis). However, because

probable cause is a more demanding standard than reasonable suspicion, *id.* at 123, and

because "the belief of guilt must be particularized with respect to the person to be

searched or seized," *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), the Court will only

minimally weigh the location of the stop in the totality.

### d.  Statements to Officers

The government also points to Baley's statements on the way to and once inside

the patrol car as supporting probable cause. According to both officers, Baley kept saying

"I just want to go home" and "I just want to see my daughter." Tr. at 21, 58. After they

reassured him that he would get to go home and see his daughter, Baley said "no, I'm

not," and placed his head in his hands. *Id.* at 21-22; 58. The officers thought this behavior

was "very strange." *Id.* at 58.

Incriminating statements by defendants can factor into probable cause

determinations. *See, e.g., United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986)

(explaining that officers can consider incriminating admissions in arriving at a conclusion

that probable cause exists to arrest). But Baley argues that his statements should not

factor into the probable cause determination because they were responsive to a question

of where he was going and were made after Officer Levitt had already decided to search

the car. Tr. at 71.

The first argument is meritless. While Officer Zgleszewski testified that it was

possible that Baley's statements were responsive to a question about where he was going,

Tr. at 62, nothing in the record shows he was asked such a question. The evidence also shows that Baley told the officers that he "just want[ed] to go home" and "just want[ed] to see his daughter," not that he was on his way home to see her. And in any event, it was ultimately Baley's statement that he will not go home and the way he put his head in his hands that was suspicious, not merely a desire to go home and see his daughter.

Baley's second argument also fails. The Court's inquiry is objective, asking not about Officer Levitt's subjective considerations or when he made his decision but whether a reasonable officer in his shoes would find the facts at the time of the search raised a fair probability that contraband would be found. *See, e.g., United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a reasonable person to believe an offense had been committed."); *see also Gomez v. Markley*, 385 F. App'x 79, 83 (3d Cir. 2010) ("Probable cause . . . is based on the totality of the circumstances available at the time of the search.") (quoting *Gates*, 462 U.S. at 230) (internal quotation marks omitted). The Court will thus consider Baley's statements.

### e. Other Factors

The government also points to Officer Levitt's testimony about the odor of marijuana and air freshener, the air freshener spray bottle that Officer Levitt recognized as a type commonly used to cover marijuana, and the presence of ashes in the cupholder as indicia of probable cause. For the following reasons, the Court will only consider the air freshener odor and air freshener bottle in the totality of the circumstances.

29

It is "well settled that the smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (citing *Humphries*, 372 F.3d at 658). Officer Levitt testified that he smelled air freshener and a mild odor of marijuana coming from either Baley's person or car. Tr. at 15; 36. He also testified that he saw an air freshener pump spray in the console that he "see[s] . . . all the time in that area" and which people use to mask the odor of marijuana. *Id.* at 16. He also testified that he saw ashes of some sort in the ashtray. *Id.*

Baley's primary argument in response is that Officer Levitt did not smell the marijuana or air freshener or see the ashes until he stuck his head inside Baley's vehicle, which constituted an illegal search of the car. The Court finds, based on Officer Levitt's concession at the suppression hearing, that Officer Levitt did place his head partially in the car, that he did so for investigatory purposes, and that he did not notice the smell of marijuana or see the ashes until his head was partially in the car.[8] However, the suppression hearing testimony and the quoted preliminary hearing testimony show that

---

[8] *See* Tr. at 40 (quoting preliminary hearing transcript where Officer Levitt testified that "I kind of stuck my head in the car. It was a very faint, I thought – believed, odor of marijuana. There was a lot of ashes in the ashtray, so I thought maybe he was just masking marijuana"); Tr. at 43 ("So as you were sticking your head in that particular car's window, it's fair to say, at that point it was being done for an investigatory purpose, yes?" "Sure."); Tr. at 43 ("So if the preliminary hearing notes indicate that it was after you stuck your head in the car that you observed the ashes and after you stuck your head in the car that you smelled the marijuana, you would have no quarrel with that, correct?" "You're absolutely right.").

Officer Levitt observed the smell of air freshener and noticed the pump spray before he stuck his head partially in the vehicle.[9]

Baley argues the marijuana odor and ashes cannot be considered in the probable cause analysis because they only came to be in Officer Levitt's knowledge as a product of an unconstitutional search. Besides Baley's allegation that Officer Levitt conducted an illegal search by sticking his head partially in the car for investigatory purposes, however, the parties have not cited any cases or further discussed the legal import of Officer Levitt's partial physical intrusion in the car on the probable cause analysis for a subsequent search. Because the fruits of that purportedly illegal search – the marijuana odor and ashes – are unnecessary factors to the resolution of Baley's suppression motion, the Court will make no conclusions in this regard. Instead, the Court assumes *arguendo* that Officer Levitt's partial physical intrusion into the car was a search, *see United States v. Montes-Ramos*, 347 F. App'x 383 (10th Cir. 2009), that the search was unsupported by probable cause, and that the fruits of that search must be ignored in a probable cause analysis for a subsequent search. Accordingly, the Court will consider the odor of air freshener and the air freshener type that Officer Levitt recognized, but will not consider the ashes or marijuana odor in the totality of the circumstances.[10]

---

[9] *See* Tr. at 15-16 (testifying he smelled air freshener when he approached the car and saw the pump spray); Tr. at 40 (quoting the preliminary hearing, where Officer Levitt testified that he smelled an odor of air freshener and saw a pump mister, and *then* testified that he kind of stuck his head in the car, smelled marijuana, and saw the ashes).

[10] Therefore, the Court also will not address Baley's argument that the ashes, without any signs that marijuana was actually being smoked, were not indicative of criminal activity.

### e.  Totality of the Circumstances

The Court will consider the totality of the circumstances known to Officer Levitt at the time of his search absent the marijuana smell and ashes. First, the Court considers Baley's frantic behavior and mannerisms, which led Officer Levitt to believe, consistent with his experience, that there was "something in the car." Tr. at 22. Baley also walked in a halting manner to the patrol car, indicating he did not want to go with Officer Levitt. His nervousness is insufficient on its own to satisfy probable cause. *See Brown*, 448 F.3d at 251 (holding that nervous behavior alone is insufficient for reasonable suspicion); *see also Wardlow*, 528 U.S. at 124 (noting probable cause is a more demanding standard than reasonable suspicion). And Baley's reluctance to walk to the patrol car does not necessarily indicate a sufficient probability that contraband would be in his car.

But other facts known to Officer Levitt, combined with Baley's nervous mannerisms and the inferences the officers drew therefrom, amount to probable cause. Officer Levitt recognized the air freshener spray as one commonly used to mask marijuana odors and noticed a strong odor of air freshener coming from either that spray or the air freshener tree on the rearview mirror. The way Baley quickly opened and closed the glove box suggested he did not want the officers to see something in it. And in that glove box, Officer Levitt briefly saw a white package that he believed, while he was not sure, to be consistent with narcotics packaging because of Baley's mannerisms and the high drug-and-gun area they were in. If these circumstances were not enough for a reasonable officer to believe there was a fair probability that contraband was in the vehicle on their own, Baley's repeated statements that he just wanted to go home and to

see his daughter, culminating in Baley's response that "No, I'm not" going to go home and dejected stance, brings the circumstances over the line and establishes probable cause. Based on the reasonable inference that Baley's actions in his car reflected an attempt to conceal something in the car, a reasonable officer would infer that Baley believed he would not go home because the officers would find something in the car now that he had been removed from it that would prevent him from remaining free. Put together, the "historical facts, viewed from the standpoint of an objectively reasonable police officer" show a "fair probability that contraband or evidence of a crime would have been found" in the car. *Donahue*, 764 F.3d at 301 (citations omitted).

Nor does Officer Levitt's testimony explaining that he felt he could search the car for safety and based on the odor of marijuana change the Court's conclusion. The probable cause inquiry is "entirely objective." *Hassley v. Pheiffer*, 750 F.3d 273, 299 (3d Cir. 2014). An officer's "opinion as to whether he had probable cause for a search does not matter because an officer might have probable cause to make a search even if he believes to the contrary." *Donahue*, 764 F.3d at 302 (citing *United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991)). Thus, the totality of the circumstances apart from the marijuana odor and ashes create probable cause irrespective of Officer Levitt's reliance on the odor of marijuana or safety concerns.

## 2. Because probable cause existed to search the car, the evidence will not be suppressed.

Because probable cause existed for Officer Levitt's search of the car, the narcotics and firearm were constitutionally recovered. *See, e.g., Donahue*, 764 F.3d at 303

(reversing a suppression of evidence found pursuant to an automobile search supported by probable cause). And once the narcotics and firearm were recovered, Officer Levitt had probable cause to arrest Baley and lawfully seized the $815 incident to arrest. *See Burton, Franklin, supra.* Therefore, the Court also alternatively denies the suppression motion on the ground that probable cause supported the search of Baley's car.[11]

## IV.    CONCLUSION

Because Officer Levitt's recovery of the cocaine in the glove box, firearm behind the glove box, and $815 from Baley's person were acquired pursuant to constitutional searches, Baley's motion to suppress will be denied.

---

[11] The Court also agrees with the government that, assuming *arguendo* that probable cause did not exist at the time Officer Levitt searched the vehicle upon removing Baley from it, probable cause existed once the narcotics in the glove compartment were uncovered. At that point, the totality included not only the above-referenced circumstances, but also direct evidence of narcotics, which justified a continued search of the car because there was a fair probability that contraband would be found. *See Donahue*, 764 F.3d at 301; *see also United States v. Orozco*, 715 F.2d 158 (5th Cir. 1983) (finding probable cause to search trunk after marijuana was found in the glove compartment). Even if probable cause did not exist for the search that led to the narcotics, reasonable suspicion that Baley had access to a weapon did. Thus, the recovery of the narcotics and firearm, and $815 incident to arrest, were constitutionally permissible under this theory, as well.

34